MAZDA OIL CORPORATION v. SLOAN.

Opinion delivered December 1, 1930.

Owens & Ehrman, for appellant.

A. L. Smith, for Thompson Oil & Gas Co.; Williams & Williams, for Forest Park Corporation and Breckenridge & Bostick, for J. W. Sloan, appellees.

McHANEY, J. This is a suit by appellant as a minority stockholder in the Forest Park Corporation, a holder of class B preferred stock therein, against appellees, J. W. Sloan, Forest Park Corporation and the Thompson Oil & Gas Company, growing out of the alleged mismanagement of the affairs of said Forest Park Corporation by Sloan as its president and its board of directors. A summer resort known as Forest Park, near Siloam Springs, was promoted by J. K. Livingston. The corporation owning and operating the property under Livingston's management was known as the Ozark Company. It

became heavily indebted to numerous creditors, including appellant, Mazda Oil Corporation, of which Julius Livingston, brother of said J. K. Livingston, was president, Mrs. A. M. Livingston, mother of J. K. and Julius, appellee Sloan, and others holding mechanics' and vendors' liens on different portions of the Forest Park properties. Appellant held a mortgage on the property subject to the prior liens. When it sought to foreclose its mortgage, an involuntary bankruptcy proceeding was instituted against the Ozark Company. Thereafter, while the matter was pending in bankruptcy, the principal creditors or their representatives got together and formulated a plan for refinancing the indebtedness of the Ozark Company, which resulted in a written agreement as follows:

"Agreement of creditors of the Ozark Company whereas, The Ozark Company, a corporation, organized under the laws of the State of Arkansas, is the owner of certain real property situated in the counties of Benton, State of Arkansas, and, Adair, State of Oklahoma, respectively, together with certain personal properties situated thereon and appurtenant thereto, comprising a single project or enterprise in the aforesaid counties, known to the public as Forest Park, and

"Whereas, the Mazda Oil Corporation, the owner and holder of real estate and chattel mortgages securing the payment of approximately $106,500, and also has a claim against the Ozark Company, unsecured, in the sum of approximately $3,500, the total of both claims, including accrued interest, amounting to approximately $110,-000, the aforesaid corporation being hereinafter referred to as The Mazda, and,

"Whereas, certain other creditors of the said The Ozark Company are the holders of liens claimed to be prior to the mortgage lien of The Mazda, covering certain of the property hereinafter referred to, amounting to approximately $85,000, said lien claim creditors being hereinafter referred to as 'lien creditors,' and

"Whereas, there are numerous unsecured creditors of the said The Ozark Company, whose claims of indebtedness aggregate the approximate sum of $184,000, which creditors will hereinafter be referred to as the 'general creditors,' and

"Whereas, there is now pending in the United States District Court for the Western District of the State of Arkansas, sitting at Fort Smith, an action for the foreclosure of the said mortgages of The Mazda, subject to the prior lien rights of the mortgagees, and such of the lien creditors as have prior rights to The Mazda, and

"Whereas, said enterprise is in the nature of a summer resort and playground for tourists, and has heretofore been extensively advertised as such and the properties constituting the same have been so co-ordinated as to constitute one single and individual integral enterprise of such character that the foreclosure of any of the aforesaid liens would so destroy the integrity of the enterprise as to render the balance of said property practically valueless for the purpose for which it has been developed, and for any purpose which might subserve the interest of the various parties connected therewith, including each of the above described classes of creditors, and

"Whereas, it is the mutual desire of each, every and all of said parties interested in said enterprise to avert the depreciation and value thereof by the interposition of any action which may possibly be circumvented, and to this end The Mazda is willing to waive its claim of priority on condition that the other parties interested, or so many thereof as shall subscribe to such agreement, as shown by audit of Peat, Marwick & Mitchell, auditors, shall consent to join with The Mazda in agreeing to turn over each, his or its, respective interest to a trustee hereinafter provided for, for the re-organization of the assets of said enterprise, as hereinafter more fully set forth.

"Now, therefore, it is agreed and consented to by each of the undersigned, that W. J. D. McCarter shall act

948

as trustee, hereinafter referred to as trustee, whose duty it shall be to procure the assent of so many of the parties interested in said enterprise as he can, upon the conditions and terms heretofore and hereinafter set forth.

"It is proposed that said trustee shall incorporate under the laws of the State of Arkansas, unless it be found necessary to incorporate under the laws of some other State, the corporation to be organized to have an authorized capital of 600,000 shares of common stock, no par value, with an authorized preferred stock of two classes, to-wit Class A and Class B—Class A preferred stock shall consist of 60,000 shares of par value of $5 per share, and Class B in the sum of $200,000 of the par value of $5 per share. Classes A and B preferred stock to be issued and disposed of as hereinafter set forth. Class A preferred stock of the new corporation shall bear an annual dividend of 7 per cent. cumulative each year, and Class B shall bear an annual dividend of 7 per cent. noncumulative. Out of Class A preferred stock there shall be issued and delivered to the creditors hereinabove referred to as 'lien creditors,' so much of said stock as will satisfy their liens dollar for dollar, and in addition thereto shall be issued and delivered to each of said lien creditors five shares of common stock, no par value, with each share of Class A preferred; the remaining Class A preferred stock shall remain in the treasury of the new corporation, subject, however, to be issued and disposed of for the purpose of obtaining funds for the development and for the carrying on of the business of said corporation, subject, however, to this proviso. That if and when there shall have been issued in excess of $200,000 of Class A preferred stock, which shall include all stock issued to lien creditors, it shall be agreed that 25 per cent. of the net proceeds of the further sale of Class A stock shall be used to retire that portion of Class B stock to the amount equal to 25 per cent. of the net proceeds thereof. This retiring feature for Class B stock shall be in addition to any other arrangements made for the retiring of this Class B stock.

"It is further agreed that, in lieu of The Mazda releasing its mortgage, that there shall be issued to it and to A. N. Livingston Class B preferred stock, in the amount of their respective established claims.

"That said Mazda, and each and every creditor, upon the signing of this instrument, or as soon thereafter as required by the trustee, shall surrender its, or his, respective claim or claims to said trustee, on receipt duly signed by said trustee obligating him, upon the organization of said new corporation, to issue to each stock of the new corporation as hereinabove and hereinafter provided for.

"It is further agreed that, out of the common stock of no par value, there shall be issued to the general creditors shares of stock in the following proportion: for each dollar due the creditor there shall be issued a share of common stock of said corporation, of no par value.

"It is understood that by the word 'claim' is meant the claim as established by the audit of Peat, Marwick & Mitchell, recently completed. In the event that there is any dispute over the audit as made by the above-named auditors, said claim shall be submitted to the board of directors of the new corporation and adjustments made according to the facts of the case.

"The Mazda further agrees that there shall be a resolution by its board of directors consenting to and agreeing that its mortgages shall be assigned to the trustee for the purposes heretofore and hereinafter set forth in said contract.

"It is further agreed that both Class A and B stock shall be retired in the following manner: A minimum of 25 per cent. of the net earning from any and all sources shall be applied to retire both Class A and Class B in proportion to the amount outstanding at the same time, immediately after the annual meeting each year, and, in case of a bond issue, 50 per cent. of the net proceeds, when realized, or so much as may be necessary, shall be used to retire both Class A and Class B stock in propor-

tion to the amount outstanding. The above agreement shall be provided for in the minutes of the new corporation and on the stock certificates.

"It is further agreed that, after said corporation has been formed, that the trustee hereunder shall take the necessary steps to have the said corporation issue to the various creditors stock in accordance with this agreement, both preferred and common, and see that the corporation shall call a meeting of all the stockholders of the common stock of said corporation by giving to them ..............days' written notice, unless the said stockholders shall have waived the notice, and to see that the by-laws of said corporation shall be so prepared and adopted as to entitle the holders of record to vote for each share of stock so held by him, and at said meeting to see that a permanent board of directors to serve at the meetings of said corporation, until their successors are duly elected and qualified, are elected.

"It is further provided that in the event of the liquidation of said new corporation that all holders of Class A preferred stock shall participate *pro rata* in the distribution of the assets of said corporation, to the extent of the par value of the stock so held by each, with accrued cumulative dividends, before Class B, or the common stock in said corporation, shall be entitled to any participation whatever. If, after Class A has been distributed, there are any assets remaining to be liquidated or distributed, Class B preferred stock shall participate in the remainder thereof *pro rata,* according to par value of stock, to the exclusion of the holders of common stock, and if, after distribution of the assets of said corporation the same shall be distributed to the owners and holders of the common stock *pro rata.*

"This agreement shall be executed in multiple copies and the signature to any one copy thereof shall be considered the signature to such agreement, and the signature to all copies hereof when assembled and bound together shall constitute the signatures to the entire agree-

ment and the terms hereof shall thereupon become and be binding on and inure to the benefit of each of the parties signatory to each of the copies hereof, and upon the heirs, successors, administrators, and assigns of each thereof.

"Each of the parties signatory hereto hereby agree that the foregoing agreement may be considered as irrevocable option up to and including the 11th day of March, 1928, but it is also agreed that in the event that any of the creditors have not joined in this contract by signing same, and accepting the terms thereof as applicable to himself, said trustee shall immediately proceed to the liquidation of The Ozark Company, and shall carry into effect as nearly as possible the contract herein set out among those who have participated herein, and the trustee shall be a trustee for all who have joined, and shall proceed as such trustee to the liquidation, adjustment and organization as nearly as possible according to this agreement, and to the distribution of stock among those who have joined herein, within ninety days from date of signature, and for this purpose all signatories and signers hereto shall remain bound until the liquidation, adjustment and organization has been completed, preserving and retaining, however, all the right of the mortgagee and lien holders, or their assigns, as they now exist or subsist.

"In witness whereof, the undersigned, as an individual, or as a corporation, as the case may be, has caused its name to be signed hereto, or its president, attested by the secretary and corporate seal, or by such party as thereunto duly authorized."

A large majority of the creditors accepted the agreement and surrendered their claims to the trustee, including appellant and Mrs. Livingston. Thereafter the Forest Park Corporation was chartered in this State, and stock was issued in accordance with the agreement, Sloan being the president. During 1928 and 1929 it borrowed large sums of money for the operation and improvement

of its properties, approximately $100,000 now due the appellee, Thompson Oil & Gas Company. Among other things, this suit challenges the right of the company to borrow this money for permanent improvements. It is also alleged that appellee Sloan agreed to purchase a sufficient amount of Class A preferred stock to finance the company, which he failed and refused to do, and that, had he done so, there would have been no occasion to borrow the money on short time notes. It is also alleged that Sloan is a one-half owner of the Thompson Oil & Gas Company, and that his failure to purchase Class A stock, and his action, or that of the company, in borrowing from the Thompson company, constituted a scheme on his part to wreck the new company and acquire all its property under judgment sale free from the lien of any other indebtedness. All these matters were put in issue by appellees, and in addition the Thompson Oil & Gas Company filed a cross-complaint against the Forest Park Corporation for the amount of its indebtedness. The latter, through its directors, confessed judgment. The court found against appellant, and dismissed its complaint for want of equity, and gave judgment on the cross-complaint.

Appellant first says that Sloan should be held liable on his agreement to subscribe for Class A preferred stock. We agree with the trial court that there was no such agreement, or at least that the preponderance of the evidence shows that there was not. It is not contended that such agreement is embodied in the ''Creditors' Agreement,'' hereinbefore set out, but that it was a contemporaneous oral agreement. Whether this character of evidence falls within the parol evidence rule, we do not find it necessary to decide, as we have already stated that according to the preponderance of the evidence no such agreement was made. It would serve no useful purpose to discuss the evidence in detail. However, when we consider how very careful Mr. Julius Livingston was in protecting his own interests and that of his mother in

other ways, it is strange that he would have signed the written agreement and have left so important a matter out of it to rest wholly in parol. Nor do we see that appellant's position would have been materially different, had Sloan bought Class A preferred stock instead of lending the money through the Thompson company. True, the company would not have this judgment against it, but it was appellant that precipitated the trouble. All Class A stock is ahead of and must be satisfied before a distribution could be made on Class B stock. Nor are we able to say that Sloan dealt unfairly or illegally with the corporation. Everything done was authorized by the board of directors and openly approved and ratified by the stockholders.

Other matters were suggested in oral argument, but we do not consider them of sufficient importance to discuss. We have carefully considered the facts as shown by the record and have reached the conclusion that the decree of the court is correct and that it should be affirmed.